IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JTS CAPITAL 4 LLC,**<br>    Plaintiff,<br><br>            v.<br><br>**NORTHWEST BANK f/k/a NORTHWEST SAVINGS BANK,**<br>    Defendant. | No. 1:25-cv-00132-CB |

### MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Defendant Northwest Bank f/k/a Northwest Savings Bank ("Northwest"), by counsel, submits this Memorandum in Support of Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and states as follows:

### Background

Northwest respectfully requests that this Honorable Court dismiss the First Amended Complaint ("Amended Complaint") with prejudice. Plaintiff, JTS Capital 4 LLC ("JTS"), purchased several different loans under a Loan Sale Agreement with Northwest which were brokered through The Debt Exchange, Inc. *A true and correct copy of the Loan Sale Agreement is attached hereto and made a part hereof as Exhibit A and is attached as Exhibit D to the Amended Complaint.*

Among the loans were two (2) identified in JTS's Complaint as "Note 1" and "Note 2". Note 1 is a commercial Promissory Note dated, August 8, 2007, in the principal amount of $3,760,000.00, wherein Pine Grove Ambulatory Surgical Center, LLC ("Pine Grove")[1] agreed to

---

[1] In its Complaint, JTS refers to Pine Grove as PGASC.

re-pay said principal sum together with interest at the initial rate of 7.750% per annum over a 20-year term.  *See* Amended Complaint ¶ 7.  A copy of Note 1 is attached to the Amended Complaint as Exhibit A.  Note 2 is a second commercial Promissory Note delivered by Pine Grove to Northwest, dated February 2, 2009, in the principal amount of $250,000.00, wherein Pine Grove agreed to re-pay said principal sum on demand together with interest at the initial rate of 5.50% per annum until the loan's maturity.  *See id.* ¶ 9.  A copy of Note 2 is attached to the Amended Complaint as Exhibit B.  Note 1 and Note 2 are hereinafter collectively referred to as the "Pine Grove Loans."

In a letter dated May 1, 2025, JTS demanded that Northwest repurchase the Pine Grove Loans for the sum of $1,071,520.65 plus legal fees incurred through the consummation of settlement.  *A copy of the letter is attached hereto and made a part hereof as Exhibit B and is attached as Exhibit F to the Complaint.*

In its Amended Complaint, JTS is demanding that Northwest repurchase the Pine Grove Loans for $1,128,076.04.  Amended Complaint ¶¶ 49, 73, 85.  Specifically, JTS has plead the following counts:  Count I, Request for Declaratory Judgment, *id.* ¶¶ 52-63; Count II, Specific Performance, *id.* ¶¶ 64-73; Count III, Breach of Loan Sale Agreement, *id.* ¶¶ 74-81; and Count IV, Unjust Enrichment, *id.* ¶¶ 82-85.  All of these causes of action relate to the same facts and arguments where JTS's claims cannot be supported by the terms of the very Loan Sale Agreement that JTS relies upon as the crux of its Amended Complaint.

**Argument**

A. Based on the Terms of the Loan Sale Agreement, JTS Cannot Support Its Allegations against Northwest.

The gist of JTS's claim under all counts is that, notwithstanding the fact JTS knew it was purchasing substandard loans and the fact Pine Grove was ceasing operations in a few weeks,[2] Northwest purportedly failed to disclose in the Review File that on December 9, 2024, it obtained confessions of judgment for both Pine Grove Loans. *Id.* ¶ 19. As in the Original Complaint, the Amended Complaint alleges that Northwest's failure to disclose the confessed judgments constitutes a material breach of the Agreement. *Id.* ¶¶ 48, 68.

JTS bases its claim upon Section 6.2.9 of the Loan Sale Agreement which provides: "To the best of the Seller's knowledge, there is no litigation, proceeding, or governmental investigation pending or any order, injunction, or decree outstanding, existing, or relating to the Loan(s) or Mortgaged Property." Ex. A § 6.2.9; *see also* Amended Complaint ¶ 28.

In the motion to dismiss the Original Complaint, Northwest argued that JTS had conveniently cherry-picked the language of Section 6.2.9, ignoring several other provisions of the Loan Sale Agreement. For example, Section 6.2 entitled "Representations and Warranties by Seller as to the Loan(s)" provides as follows: "except as otherwise disclosed in the Review File or in **publicly available records**, the Seller hereby represents and warrants that as to the Loan(s), the following representations and warranties are true and correct in all material respects as of the date

---

[2] *See* Amended Complaint ¶¶ 11-14 (beginning in 2018, Pine Grove experienced several operational setbacks, including its merger with Allegheny Health Network, inability to recruit new surgeons, and changeover in management, leading Northwest and Pine Grove to enter into a series of forbearance agreements; in 2024, Northwest sent written notices of default to Pine Grove demanding payment in full for the principal amount outstanding on the Pine Grove Loans together with counsel fees and costs or interest and fees accruing thereafter). In the Original Complaint, Plaintiff asserted that Pine Grove and Northwest had entered into a "fourth and final forbearance agreement." *See also id.* ¶¶ 31-33 (prior to closing Northwest uploaded a memo to the Review File on December 17, 2024 which was one day before the bid date where the memo stated that Northwest had received notice that Pine Grove planned to shut down and Northwest planned to initiate foreclosure proceedings).

hereof." Ex. A § 6.2 (emphasis added). Section 6.2, by its very terms excludes any of the representations and warranties set forth in its subparts, including Section 6.2.9, where publicly available records exist.

Northwest argued in its original motion to dismiss that the confessed judgments are publicly available records, as Northwest's counsel was easily able to obtain the civil case dockets for both confessed judgments from Warren County.[3] JTS acknowledges as much in its Amended Complaint at Paragraph 19 despite the fact that it conveniently omitted as exhibits in its Amended Complaint the judgments it had attached as exhibits in the Original Complaint. *See* Original Complaint ¶¶ 17-18, Exhibits "D and E."

The same argument still holds true with regard to the Amended Complaint. In an effort to avoid the fact that the confessed judgments were publicly available records, JTS now attempts to sidestep the obvious by claiming that, by reason of a December 3, 2024 Pine Grove internal memo, providing that Pine Grove would be moving forward with business dissolution and ceasing operations, Northwest, "upon information and belief," possessed non-publicly available information of Pine Grove's decision to cease operations and that, with such knowledge, confessed judgment. *See* Amended Complaint ¶¶ 15-18.

---

[3] Although the Court normally would not be permitted to consider any documents outside the exhibits to the complaint when deciding a motion to dismiss, the Third Circuit has specified that courts may consider matters of public record and other matters of which a court may take judicial notice, court orders, and exhibits attached to the complaint when adjudicating a motion to dismiss under Rule 12(b)(6). ***Oshiver v. Levin, Fishbein, Sedran & Berman***, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing 5A Wright and Miller, *Federal Practice and Procedure: Civil 2d*, § 1357; ***Chester County Intermediate Unit v. Pennsylvania Blue Shield***, 896 F.2d 808, 812 (3d Cir. 1990)). Here, there can be no dispute that the dockets reflecting the entered judgments are publicly available records. Additionally, the judgments were initially attached by JTS to its Original Complaint as Exhibits D and E; however, notably, JTS failed to attach the judgments to its Amended Complaint. *The judgments that JTS attached to its Original Complaint as Exhibits D and E and dockets are now collectively attached hereto and made a part hereof as Exhibit C-1. The publicly available dockets from Warren County for both judgments are collectively attached hereto and made a part hereof as Exhibit C-2.*

Whether the "Internal Memo" referenced in Paragraph 15 of the Amended Complaint was publicly available or not is irrelevant to the confessed judgments themselves as they were publicly available records. Had JTS – which, by its own account on its website, has a specific "expertise" in distressed asset investing -- simply done a search of the publicly available records, such a search would have readily disclosed the confessed judgments entered against Pine Grove. Ex. A § 6.2.

In addition to this publicly available information, JTS, oddly enough, admits that it was aware on December 17, 2024 (before its bid date), that Pine Grove was shutting down in just a few weeks on January 1, 2025, and that Northwest planned to initiate foreclosure proceedings. Amended Complaint ¶¶ 31-33.[4] This is the same information JTS claims it was not aware of in what it refers to as the December 3rd internal memo.[5] Notably, while JTS chose not to attach the December 17th memo to the Complaint, this Court may consider the memo. As the Third Circuit explained in *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993):

> [t]o decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record[,] . . . a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied.

*Id.* at 1196 (citations omitted). Accordingly, Northwest hereby attaches the memorandum dated December 17, 2024, which was uploaded to the Review File room. *A true and correct copy of the*

---

[4] Paragraph 33 of the Complaint states: "[Northwest]'s representations in the December 17, 2024 memo did mention or discuss that it obtained the Loan Judgments against [Pine Grove] prior to closing." If this statement is correct, it is in Northwest's favor. However, Northwest assumes that this statement is a typographical error and should state " . . . did [not] mention or discuss . . .". It is still irrelevant, however, as JTS acknowledges that, through the December 17th memo, it knew that Pine Grove was shutting down in just a few weeks, and that the confessed judgments were publicly available. Amended Complaint ¶ 19.

[5] The December 3rd memo provided that Pine Grove was moving forward with dissolving the business and ceasing operations. *See id.*, Ex. "C."

5

*Memo is attached hereto and made a part hereof as Exhibit D.* The Memo states that "the Seller has received notice that the Borrower plans to shut down on January 1, 2025 and the Seller has planned to initiate Foreclosure proceedings." Ex. D. JTS's representatives not only accessed the memo but downloaded and printed the memo on December 17th. *See* Exhibit E, *a true and correct copy of the screen capture of JTS's representatives' activities in the Review File room*,[6] whereby Buddy Leigh from JTS downloaded the memo on December 17, 2024, at 11:51 A.M., and Karsten Schattschneider from JTS opened the memo on December 17, 2024, at 12:33 P.M. and printed the memo on the same day at 12:42 P.M.

Despite clearly knowing of the distressed nature of Pine Grove, its imminent dissolution and Northwest's intent to foreclose *because Northwest told them*, JTS nevertheless went forward and bid on the distressed notes ultimately purchasing them with this knowledge. In an attempt to skirt its knowledge that Pine Grove was shutting down and the readily public nature of the confessed judgments, JTS now argues that the December 17th memo did not mention or discuss the confessed judgments against Pine Grove. *See* Complaint ¶ 33.

Whether or not the December 17th memo mentioned the confessed judgments is irrelevant as JTS knew before its bid that Pine Grove was shutting down in but a few weeks and that Northwest planned to foreclose -- *in addition* to the fact that the confessed judgments were publicly available. Furthermore, JTS's suggestion that the confessed judgments significantly devalued the value of the notes causing it to overpay to acquire the notes in question is belied by the fact it knew before bidding that Pine Grove was shutting down where foreclosure proceedings were being planned.

---

[6] Exhibit E is partially redacted, because it referenced other loan files, unrelated to the current action.

Further, as previously noted, JTS bases its claim upon Section 6.2.9 of the Loan Sale Agreement which provides: "To the best of the Seller's knowledge, there is no **litigation**, proceeding, or governmental investigation pending or any order, injunction, or decree outstanding, existing, or relating to the Loan(s) or Mortgaged Property." Ex. A § 6.2.9 (emphasis added); *see also* Complaint ¶ 28. "[L]itigation" is a specifically defined term in Section 8.3 of the Loan Sale Agreement. Ex. A § 8.3. That section provides, among other things, that if the loan(s) are or become subject to any claim, action, lawsuit, foreclosure action, bankruptcy, or other proceeding, administrative or judicial or similar action filed by or against any obligor (collectively "Litigation"), JTS is required to, within so many days after closing, provide the name of its counsel to Northwest so that counsel can enter its appearance on behalf of JTS. However, a confession of judgment is not a lawsuit, action, or proceeding, but simply a publicly available judgment that was entered against Pine Grove.

Other sections of the Loan Sale Agreement support the fact that JTS, as a sophisticated purchaser of distressed loans, certainly knew it was purchasing distressed loans at a discount where it was required to conduct its own due diligence. For example, Section 4.1 provides that JTS was purchasing the loans "as-is." *Id.* § 4.1. In agreeing to Section 5.5 of the Loan Sale Agreement, JTS admitted that:

> [JTS's] bid and decision to purchase the Loan(s) is based upon its own comprehensive review and independent expert evaluation and analysis of the Review File and other materials deemed relevant by the Buyer and its agents. . . . The Buyer has made such independent investigation as the Buyer deems to be warranted into the nature, title, attachment, perfection, priority, validity, enforceability, collectability, and value of the Loan(s), the title, condition and value of any collateral securing the Loan(s), the market conditions and other characteristics of the places where any such collateral is located, and all other facts it deems material to the purchase of the Loan(s).

*Id.* § 5.5.

Additionally, Section 6 provides:

> [Northwest] has not, does not and will not make any representations or warranties with respect to the collectability of any Loan or any amounts due under any Loan, or the value or condition of the Mortgaged Property or other collateral securing repayment of any Loan(s). To the extent the Loan(s) constitute personal or real property, such property is sold "as is, where is," and [Northwest] expressly disclaims any representations or warranties, express, implied, statutory or otherwise, with respect to such property.

*Id.* § 6.

Accordingly, based on the terms of the Loan Sale Agreement, JTS cannot support its allegation that Northwest had any responsibility to disclose the confessed judgments to JTS. *See id.* §§ 6.2.9, 8.3. Also, according to the terms of the Loan Sale Agreement, JTS instead had the responsibility to search for publicly available records as JTS acknowledged that it had done a comprehensive review of all the loans, including the Pine Grove Loans, with an independent expert evaluation, all of which would have discovered the confessed judgments. *See id.* §§ 5.5, 6.2. JTS also admitted that it had purchased all the loans, including the Pine Grove Loans, in "as-is" condition, whereas Northwest made no representations or warranties that JTS could ever collect on any of the loans it purchased, including the Pine Gove Loans. *See id.* §§ 4.1, 6. Consequently, all of JTS's claims are undermined by the very agreement it relies upon and its admission in the Amended Complaint that it knew Pine Grove was shutting down. As such, JTS has failed to state a claim upon which relief may be granted.

    B.    <u>JTS Failed to Establish that Northwest Must Repurchase the Pine Grove Loans and Failed to Allege or Establish Any Actual Damages</u>

Assuming JTS were able to establish that Northwest was required to disclose the confessed judgments and failed to do so, JTS would still have to establish causation for any damages suffered. Tellingly, JTS fails to allege that, had it known about the confessed judgments, it would not have purchased the Pine Grove Loans. Instead, JTS merely seeks to have Northwest repurchase the

8

Pine Grove Loans. JTS alleges in its Amended Complaint that it relied upon documents in what it terms the Review File and an assignment of rents contained within the loan file during its "due diligence" in performing its own valuation of the assets backing the Pine Grove loans. Amended Complaint ¶ 41.

However, JTS admits in its Complaint that it knew Pine Grove was shutting down prior to its bid where any assignment of rents would have no effect with Pine Grove ceasing operations. Moreover, JTS failed to disclose to the Court that the Pine Grove Loans were also secured by a mortgage on property owned by Pine Grove. *Attached hereto as Exhibit F is the publicly recorded and available mortgage securing the Pine Grove loans.* As the mortgage is a publicly available record, this Court may consider it. Additionally, as noted above, a defendant may attach pertinent documents to a motion to dismiss if the plaintiff did not attach them to the complaint, and the documents will be considered part of the pleadings if they are referred to in the complaint and are central to the plaintiff's claim. ***Pension Ben. Guar. Corp.***, 998 F.2d at 1196. Accordingly, as the Complaint referred to the mortgage, Complaint ¶¶ 8, 28, related to the Pine Grove Loans, which are central to JTS's claim, Northwest is permitted to attach the mortgage to this motion to dismiss. ***See Pension Ben. Guar. Corp.***, 998 F.2d at 1196.

As the Pine Grove Loans are secured by mortgaged property, JTS can certainly foreclose or execute under the existing confessed judgments against the property and recoup any monies conceivably owed. Additionally, assuming, for argument's sake, that JTS could allege and establish causation of damages, JTS still cannot demand that Northwest repurchase the Pine Grove Loans. According to the Loan Sale Agreement:

> If such breach or failure is not duly cured within such ninety (90) day period, or not waived or consented to in writing by the Buyer, the Seller shall elect, **in its sole discretion** to **either** (i) repurchase the Loan(s) at the Repurchase Price, **or** (ii) to

9

>pay to Buyer the Buyer's actual damages directly caused by such breach, up to an amount not exceeding the Repurchase Price.

Ex. A § 21 (emphasis added).[7] Consequently, even if JTS established all other elements of its claims, Northwest "in its sole discretion" dictates what the appropriate remedy would be. *Id.* In other words, under the Loan Sale Agreement, Northwest would be able to elect to pay JTS its actual damages not to exceed the Repurchase Price instead of repurchasing the Pine Grove Loans. Accordingly, JTS **cannot** demand that Northwest repurchase the Pine Grove Loans. *Compare id.* *with* Amended Complaint ¶¶ 49-50, 71.

    C.    <u>JTS's Specific Performance Claim Fails as a Matter of Law</u>[8]

Count II of the Amended Complaint is a cause of action for specific performance. "Specific performance is only appropriate where the uniqueness of goods precludes a remedy in damages." ***Glenn Distributors Corp. v. Carlisle Plastics, Inc.***, 297 F.3d 294, 303 (3d Cir. 2002); *see also* ***Greenwald Caterers Inc. v. Lancaster Host, LLC***, 599 F. Supp. 3d 235, 256 (E.D. Pa. 2022) (for purposes of specific performance, damages cannot be accurately ascertained "where the subject matter of an agreement is an asset that is unique or one such that its equivalent cannot be purchased on the open market"); ***Proyectos Electronicos, S.A. v. Alper***, 37 B.R. 931, 933 (E.D. Pa. 1983) ("a buyer is entitled to specific performance if the goods are unique or in other proper circumstances"). Courts in multiple jurisdictions have repeatedly rejected claims for specific performance where the plaintiff fails to establish the uniqueness of the relief requested, including at least one case involving loans. ***See In re MJK Clearing, Inc.***, 286 B.R. 109, 125 (Bankr. D. Minn. 2002)

---

[7] Furthermore, Section 21 of the Loan Sale Agreement provides that, **if** Northwest breached any representation or warranty, JTS must provide notice of said breach to Northwest within thirty (30) days of discovery of the breach. Ex. A, Loan Sale Agreement § 21.

[8] Count I of the Complaint, JTS's Request for Declaratory Judgment, is based upon the same facts as discussed in Sections A and B *above*. Ergo, any additional argument would be redundant, and this Honorable Court should dismiss Count I for the same reasons as discussed *above*.

(specific performance was not warranted in effort by creditor to require trustee to return funds that were transferred by creditor to debtor brokerage firm pursuant to securities lending transactions, where master securities loan agreement (MSLA) governed transactions, MSLA provided creditor with adequate remedy at law for debtor's breach of agreement, and property involved was not so unique that measure of damages would have been difficult to calculate); *see also, e.g., Klein v. PepsiCo, Inc.*, 845 F.2d 76 (4th Cir. 1988) (aircraft is not "unique" to require specific performance); *i.Lan Systems, Inc. v. Netscout Service Level Corp.*, 183 F. Supp. 2d 328 (D. Mass. 2002) (applying Massachusetts law) (software that was copyrighted and the product of intense labor was held not to be unique or irreplaceable, where the software was mass-produced and interchangeable with a number of competing software packages that ran on ordinary computers and performed substantially the same functions as the software at issue); *Lezell v. Forde*, 26 Misc. 3d 435, 447, 891 N.Y.S.2d 606, 616–17 (Sup. Ct. 2009) (plaintiff sought injunction; complaint alleged that "[t]he Property which is the subject matter of the contract of sale is unique, valuable and irreplaceable" but alleged no other facts, and no other evidence was offered "that would support an inference as to those conclusions and that suitable alternatives are not available in the market to allow cover or a reasonably certain determination of damages based upon the market price/ contract price differential"; court therefore found that the plaintiffs "failed to demonstrate a likelihood of success on the merits of their cause of action for specific performance . . . injury if preliminary injunctive relief is not granted"); *Pierce-Odom, Inc. v. Evenson*, 632 S.W.2d 247 (Ark. App. 1982) (specific performance of a contract for the sale of a mobile home to the plaintiffs was improperly ordered by the trial court, even though the plaintiffs proved part performance of the contract by the defendant so as to take the contract out of the Statute of Frauds, where there were no allegations or proof by the plaintiffs that the particular mobile home in question had a

unique or peculiar value or that there were any circumstances requiring specific performance of the contract).[9]  There is nothing unique about the purchase of substandard loans and these particular loans.

Moreover, "[s]pecific performance should only be granted ... where no adequate remedy at law exists." *Greenwald Caterers*, 599 F. Supp. 3d at 256.  Here, JTS has an adequate remedy if it were to prevail.  JTS can foreclose or execute on the mortgaged property and determine what loss, if any, incurred between its loan purchase price and the amount received from executing against the mortgaged property.[10]  *See* Ex. D.  For this additional reason, JTS has failed to state a claim for specific performance.

> D. JTS's Breach of Loan Sale Agreement Claim in Count IIII of the Amended Complaint Fails as a Matter of Law

JTS next alleges at Count III of the Amended Complaint that Northwest breached the Loan Sale Agreement.  *See* Complaint, Count III, ¶¶ 74-81.  This entire claim fails as a matter of law.

After noting in Paragraph 77[11] of the Complaint that Section 6.2.5 of the Loan Sale Agreement precludes Northwest from modifying Note 1 and Note 2 except as disclosed in the Review File, JTS asserts in Paragraph 78 of the Complaint that Northwest "modified Note 1 and Note 2 upon taking the Loan Judgments and failing to disclose these documents in the Review File in breach of Section 6.2.5 and Section 7.1 of the Loan Sale Agreement." *Id.* ¶¶ 77-78.  However,

---

[9] *See also In Duval & Co. v. Malcom,* 214 S.E.2d 356 (Ga. 1975) (where the price of cotton rose dramatically, the buyer sought specific performance of the contract solely on the ground that the price increase made the cotton unique; the court denied specific performance); *Hilmor Sales Co. v. Helen Neushaefer Div. of Supronics Corp.*, 6 U.C.C. Rep. Serv. 325 (N.Y. Sup. 1969) (plaintiff sought to enjoin the defendant from disposing of lipstick and nail polish which were the subject of a sales contract; according to the court, the only unique aspect of the contract was the "closeout" price; the buyer could not purchase similar goods at such a favorable price elsewhere, but he did not claim that replacement was impossible; the court denied specific performance).

[10] In fact, JTS, upon execution on the property, may very well receive an amount in excess of its loan purchase price.

[11] In Paragraph 77 of the Complaint, JTS incorrectly quotes Section 6.2.5 of the Loan Sale Agreement, which should read (with correct or missing text in bold):  "The Note(s) and Mortgage(s) **and** any document**s** modifying their terms included in the Review File are true and correct copies of the documents they purport to be and have not been superseded, amended, modified, canceled o**r** otherwise changed except as disclosed in the Review File."

a confession of judgment – or any judgment – does not "modify" a note in any fashion. A debtor's obligations under a note and other related loan documents still exist before and after a confessed judgment. The confessed judgments did not supersede amend, modify, or cancel the notes and related loan documents, and JTS has not shown how the confessed judgments modified in any way the notes or related loan documents. To the contrary, the confessed judgments did not modify any term of the notes and related loan documents as it is merely one of many rights and remedies available to a lender (now JTS) which it may exercise. Pine Grove's obligations under the notes and related loan documents remain and JTS, as it well knows, has all rights and remedies available to it under the notes and related loan documents regardless of the confessed judgments.

JTS continues its nonsensical argument by suggesting that Note 1 and Note 2 are not enforceable and were rendered nullities as valid loan documents after the confessions of judgment. *Id.* ¶ 79. Such a suggestion is absurd as a confessed judgment does not stop or nullify a note from being enforced. Instead, the opposite is true – *i.e.*, the confession of judgment shows that the notes are enforceable. In fact, the notes themselves specifically provide that the authority granted in the notes to confess judgment against Pine Grove shall not be exhausted by any exercise of that authority, but shall continue from time to time and at all times until payment in full of all amounts due under the notes. *See id.*, Exs. A-B.

Accordingly, JTS's entire argument in Count III is nonsensical, and its cause of action for breach of the Loan Sale Agreement should be dismissed.

E.    JTS's Unjust Enrichment Claim Fails as a Matter of Law

Count IV of the Amended Complaint contains a cause of action for unjust enrichment plead "[i]n the alternative" to Count II's claim for specific performance. *Id.* ¶ 83. According to said count, JTS is "entitled to recover money damages against [Northwest] as and for its material

breaches of the Loan Sale Agreement" and "damages due to [Northwest]'s breach of the Loan Sale Agreement[.]" *Id.* ¶¶ 83, 85.

However, if there is a contract governing the subject matter of the dispute, unjust enrichment based on a theory of quasi-contract is not an available claim. *Jaraczewski v. Equity Nat'l Title & Closing Servs.*, No. CV 23-274, 2024 WL 3861248, at *4 (W.D. Pa. Aug. 19, 2024) (citing *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 n. 5 (Pa. Super. 2009); *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999))). Hence, JTS cannot base its claim for unjust enrichment on Northwest's alleged material breaches of the Loan Sale Agreement. JTS has thereby failed to state a claim for unjust enrichment, upon which relief can be granted.

## Conclusion

For the reasons set forth above, Defendant Northwest Bank f/k/a Northwest Savings Bank respectfully moves this Honorable Court to dismiss JTS Capital 4 LLC's Amended Complaint with prejudice.

Dated: August __, 2025                    Respectfully submitted,

By: */s/ McArdle Booker*
    Nicholas Poduslenko, Esq. (*pro hac vice forthcoming*)
    OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
    1500 Market Street, Suite 3400
    Philadelphia, PA 19102
    nicholas.poduslenko@obermayer.com
    Phone: (215) 665-2356
    Fax: (215) 665-3165

    Brooke Newborn, Esq. (*pro hac vice forthcoming*)
    OBERMAYER REBMANN MAXWELL & HIPPEL, LLP

                    Doylestown Commerce Center
                    2003 S. Easton Road, Suite 304
                    Doylestown, PA 18901
                    brooke.newborn@obermayer.com
                    Phone: (267) 742-3363
                    Fax: (267) 742-3363

                    D. McArdle Booker, Esq. (Pa. ID # 320890)
                    OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
                    525 William Penn Place, Suite 1710
                    Pittsburgh, PA 15219
                    mcardle.booker@obermayer.com
                    Phone: (412) 556-2476
                    Fax: (412) 556-2476

                    *Counsel for Northwest Bank f/k/a Northwest Savings Bank*